Superior Pattern and Manufacturing Company v. Commissioner.
Superior Pattern & Mfg. Co. v. Commissioner
Docket Nos. 64612 and 70272.
United States Tax Court
T.C. Memo 1959-70; 1959 Tax Ct. Memo LEXIS 178; 18 T.C.M. (CCH) 343; T.C.M. (RIA) 59070; April 13, 1959
*178 Prior to the years in issue petitioner, a corporation engaged in the patternmaking business, paid its four officers fixed salaries. During the years in issue petitioner paid its officers salaries computed in part by a profit-sharing formula. The four officers were petitioner's sole stockholders and composed petitioner's board of directors. The salaries were substantially in excess of the salaries paid in the immediately preceding years. Respondent determined the salaries to be excessive and disallowed in part petitioner's deduction for the salaries. Held, on the facts, the salaries paid petitioner's officers during the years in issue were reasonable compensation for the services rendered within the meaning of section 23(a)(1)(A), I.R.C. 1939, and section 162(a)(1), I.R.C. 1954. Melvin S. Huffaker, Esq., and Pell Hollingshead, Esq., for the petitioner. Walter S. Hart, Esq., and Robert W. Siegel, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: These consolidated proceedings involve deficiencies in income taxes of petitioner as follows: Taxable Year Ended
Deficiency
Feb. 28, 1954
$58,603.70
Feb. 28, 1955
32,415.28
Feb. 29, 1956
20,316.97
The issue is whether the salaries paid by petitioner to its officers during the years in question were reasonable in amount. Other issues have been conceded by petitioner. Findings of Fact The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner, a Michigan corporation, filed its income tax returns for the years in issue with the district director of internal revenue at Detroit, Michigan. Petitioner was incorporated in 1947 and was the successor of a partnership organized in 1923 by Theodore Trefzer and another individual. On February 28, 1954, petitioner's common *180 and non-voting preferred stock was held as follows: Percentage
Percentage
Stockholder
Common
Held
Preferred
Held
William H. Sigsworth
2,000
25%
20,000
42,55%
Theodore Trefzer
2,000
25%
20,000
42.55%
William H. Sigsworth, Jr.
2,000
25%
3,500
7.45%
Theodore W. Trefzer
2,000
25%
3,500
7.45%
At all times pertinent petitioner was engaged primarily in the highly competitive business of making patterns in the automotive and aircraft fields. Petitioner's pattern work was done on a job basis, and its jobs were obtained through competitive bidding against similar pattern shops. Petitioner had a fine reputation in the pattern industry. Patternmaking requires a high degree of specialized skill and technical know-how. Journeyman patternmakers are men who have completed an apprenticeship training period lasting five years. During the years in issue journeyman patternmakers earned annual salaries averaging between $8,000 and $10,000. The standard operating procedure in petitioner's business was as follows: Petitioner's officers were the salesmen. One of the officers would receive a purchase requisition from a potential customer. The officer *181 would usually get together with one or more of the other officers and arrive at an estimated price for the job. A bid would then be submitted to the requisitioning company. If the bid was accepted, petitioner's officers would gather for a so-called "skull" session wherein they tried to figure money-saving procedures and short cuts in filling the job order. The "skull" sessions were an important part of petitioner's operating procedure, for they often resulted in increasing petitioner's margin of profit on a job, and occasionally resulted in savings to a customer. Chuck Williams, general superintendent in charge of production, at times participated in the estimate work and in the "skull" sessions with petitioner's officers. The officer who brought in the job acted as a liaison between the customer and petitioner. He was responsible for making any amendments or changes in the pattern plans requested by the customer and for price adjustments made necessary as a result of the customer's requested alterations. The officer in a general way supervised the filling of the order to make sure that the delivery date would be met. At all times pertinent William H. Sigsworth, hereinafter referred *182 to as Harry, was president and a director of petitioner. He was a journeyman patternmaker and had been in the pattern business since 1908. His experience in the pattern business encompassed pattern production, estimating and selling of pattern jobs. He had a fine reputation in the industry. Harry became connected with petitioner's predecessor company in 1925. During the years in issue Harry was petitioner's primary administrative officer. He did not seek out new customers as he had done in earlier years, but he did continue to sell to and service accounts he had accumulated before the years in issue. He also participated in the estimate work and in the "skull" sessions. In 1939 another pattern company offered Harry a job with an annual salary of $50,000. At all times pertinent Theodore Trefzer, hereinafter referred to as Theodore, was treasurer and a director of petitioner. He had fulfilled the requirements of a journeyman patternmaker, and had worked in the pattern industry almost continuously since 1906. His experience encompassed all phases of the pattern business. His reputation in the industry was "excellent." He was devoted to his profession and worked long hours during the *183 years in issue. He was in overall charge of production. Chuck Williams, the plant superintendent, was in direct charge of production but was answerable to Theodore. Theodore also participated in the estimate work and in the "skull" sessions. At all times pertinent William H. Sigsworth, Jr., hereinafter referred to as Bill, was vice-president and a director of petitioner. Bill is Harry's son. He was a journeyman patternmaker and had worked in the pattern industry almost continuously since 1940. His experience encompassed all phases of the pattern business. He had the reputation of being a good patternmaker. Bill became a salesman in 1949 and since that time had brought petitioner substantial amounts of new business. In November 1952, for example, he was responsible for obtaining two orders from new customers totalling over $390,000. During the years in issue Bill devoted his time to sales and estimate work and participated in the "skull" sessions. He also handled grievances of petitioner's employees and served as petitioner's representative on an industry-wide negotiating committee. At all times pertinent Theodore W. Trefzer, hereinafter referred to as Ted, was secretary and a *184 director of petitioner. Ted is Theodore's son. He was a journeyman patternmaker and had worked in the pattern industry almost continuously since 1938. His experience prior to the years in issue encompassed all phases of the pattern business with the exception of sales. During the years in issue Ted spent most of his time in the production phase of petitioner's business, working with Chuck Williams and Theodore. He also did estimate work and participated in the "skull" sessions. In 1953 Ted began to experiment with the use of plastics in patternmaking. He developed several important uses for plastics which resulted in substantial money savings to petitioner. In 1955 Ted started to do some selling in addition to his other duties. He was successful in obtaining several new customers for petitioner. The following salaries were paid to each of petitioner's officers during the fiscal years ended February 28, 1949 through February 28, 1953: Year Ended
Harry
Theodore
Bill
Ted
Feb. 28, 1949
$40,000.00
$40,000.00
$12,890.00
$12,890.00
Feb. 28, 1950
30,000.00
30,000.00
12,000.00
12,000.00
Feb. 28, 1951
40,000.00
40,000.00
15,333.34
15,333.34
Feb. 29, 1952
40,000.00
40,000.00
17,000.00
17,000.00
Feb. 28, 1953
40,000.00
40,000.00
17,650.00
17,650.00
*185 On May 26, 1953, after the lifting of the Korean War wage freeze, petitioner's board of directors, composed of Harry, Theodore, Bill and Ted, passed the following resolution: "RESOLVED, that the following compensation be paid executives and key employees of the corporation for its fiscal year March 1, 1953 to February 28, 1954: "Theodore Trefzer, Sr.
$2,500.00 per month
William H. Sigsworth, Sr.
2,500.00 per month
William H. Sigsworth, Jr.
1,250.00 per month starting May 1, 1953
Theodore W. Trefzer
1,250.00 per month starting May 1, 1953
Charles Williams
290.00 per week starting May 10, 1953
"Plus the following additional compensation: "The corporation will set aside and pay 30% of its net profits, before Federal Income Taxes, into a fund and this fund is to be divided as follows: "25%
William H. Sigsworth, Sr.
25%
Theodore Trefzer, Sr.
15%
William H. Sigsworth, Jr.
15%
Theodore W. Trefzer
10%
Charles Williams
10%
To be divided between ten
other key employees."
Petitioner's officers were paid pursuant to the above plan throughout the years in question and received the following salaries: William H.
Theodore
William H.
Theodore W.
Sigsworth,
Trefzer,
Sigsworth, Jr.,
Trefzer,
President
Treasurer
Vice-Pres.
Secretary
Feb. 28, 1954
Base
$30,000
$30,000
$14,700
$14,700
Bonus
31,175
31,175
18,705
18,705
$61,175
$61,175
$33,405
$33,405
Feb. 28, 1955
Base
$30,000
$30,000
$15,000
$15,000
Bonus
27,125
27,125
16,275
16,275
$57,125
$57,125
$31,275
$31,275
Feb. 29, 1956
Base
$30,000
$30,000
$15,000
$15,000
Bonus
19,700
19,700
11,800
11,800
$49,700
$49,700
$26,800
$26,800
*186 The following is a summary of petitioner's operations for the fiscal years ended February 28, 1949 through February 29, 1956: Year Ended
Gross Sales
Gross Profits
Officers Salaries
Taxable Income
Feb. 28, 1949
$ 706,828.53
$295,944.36
$105,780.00
$113,147.29
Feb. 28, 1950
542,178.58
217,606.81
84,000.00
73,416.54
Feb. 28, 1951
773,587.86
297,251.50
110,666.68
108,017.08
Feb. 29, 1952
963,502.06
392,590.56
114,000.00
167,059.18
Feb. 28, 1953
1,166.193.19
423,474.47
115,300.00
181,748.30
Feb. 28, 1954
1,560,810.55
625,666.23
189,160.00
291,038.70
Feb. 28, 1955
1,443,837.70
580,124.04
176,800.00
253,283.87
Feb. 29, 1956
1,542,912.93
495,132.83
153,000.00
183,619.76
The only cash dividend paid by petitioner on its common stock since its incorporation in 1947 was a $25,000 dividend in the fiscal year ended February 28, 1951. Petitioner paid a $35,250 cash dividend on its preferred stock on December 5, 1955. It paid an additional $28,200 cash dividend on its preferred stock on May 29, 1956. Respondent determined that the salaries paid to petitioner's officers were excessive. He determined a reasonable compensation *187 for Theodore and Harry to be $40,000 each for each of the years in issue, and for Bill and Ted to be $17,650 each for each of the years in issue. He disallowed petitioner's deduction of salary payments in excess of these amounts. The salaries paid to petitioner's officers during the years in issue were reasonable compensation for the services rendered. Opinion The only issue is whether the salaries paid to petitioner's officers during the years in issue were "reasonable" within the meaning of section 23(a)(1)(A), Internal Revenue Code of 1939, and section 162(a)(1), Internal Revenue Code of 1954. This is essentially a fact question, and the burden of proof is on the petitioner. Geiger & Peters, Inc., 27 T.C. 911. A decision on an issue such as this requires the consideration and weighing of numerous factors, no one of which is decisive. Among the factors to be considered are the duties and qualifications of petitioner's officers; the scarcity of persons having the particular abilities or skills required for the positions; the volume and amount of petitioner's business, including its special or peculiar characteristics; the relationship between *188 the officers' salaries and petitioner's gross and net income during the years in issue and during the immediately preceding years; the salaries paid officers in competitive pattern companies, taking into consideration the differences and similarities in their duties as compared to the duties of petitioner's officers; petitioner's corporate structure and the composition of its directorate; the salaries paid petitioner's officers in preceding years; the salaries paid petitioner's other employees; and general economic conditions. Mayson Manufacturing Co. v. Commissioner (C.A. 6, 1949), 178 Fed. (2d) 115; Geiger & Peters, Inc., supra. Respondent argues that petitioner paid its officers excessive salaries during the years in issue. He states that petitioner was a closely-held corporation and that there was no arm's-length bargaining over the salaries of petitioner's officers. He contends that since petitioner's officers were also its sole stockholders, there was no need to base salaries on a bonus or incentive plan because first, petitioner's officer-stockholders obviously needed no special incentive payments due to their proprietary interests, and second, *189 petitioner's officer-stockholders could get the profits in the form of dividends instead of salaries. He concludes that petitioner's bonus plan was nothing but a "device designed to reap the most profit from the business with the least tax expense." We do not agree with respondent's arguments. It should be noted that there is nothing in the applicable statutes or regulations declaring salaries paid on the basis of a bonus plan unreasonable per se. In numerous cases this Court and other courts have found salaries paid to officer-stockholders on the basis of profit-sharing bonus plans to be reasonable in amount. Roth Office Equipment Co. v. Gallagher (C.A. 6, 1949), 172 Fed. (2d) 452; Geiger & Peters, Inc., supra. The above cases illustrate that the ultimate question to be decided is whether the compensation was reasonable in amount. The formula by which the corporation computed the compensation is not of commanding importance. Petitioner in the instant case was engaged in the highly competitive business of patternmaking. The apparent success of petitioner's business during the years in issue was the result of many factors, including (1) the fine reputation *190 petitioner enjoyed as a result of the recognized skills and abilities of its officers; (2) the business connections of petitioner's officers and their ability to obtain purchase requisitions; (3) the imagination and inventiveness of petitioner's officers in their estimate work which made possible successful bidding for jobs; and (4) the ingenuity of petitioner's officers in the "skull" sessions wherein they devised money-saving procedures which increased petitioner's profits. Petitioner's officers were well trained in the highly technical work of patternmaking. Harry and Theodore each had over 45 years' experience in the pattern business prior to the years in issue. Ted and Bill each had approximately 15 years' experience in the business. The professional reputations of petitioner's officers were unquestioned. Officers of competitive pattern companies testified that Harry's and Theodore's reputations were "excellent," "fine," "one of the best in the country." One witness termed Theodore's ability "unique." Another testified men of such abilities are "very few and very hard to find." Bill also had the reputation of being a good patternmaker. Ted's ability and value to petitioner *191 during the years in issue was exemplified by his important contribution in the plastics field. Respondent recognizes the specialized training and reputation of petitioner's officers, but he argues that there was no substantial increase in their duties and responsibilities during the years in issue to justify the increase in their salaries over the immediately preceding years. Respondent neglects to consider that petitioner's increased sales and profits were the direct result of the efforts of its four officers. It seems quite justifiable under the circumstances for the officers' salaries to vary directly with the fortunes of the business. The aggregate salaries paid petitioner's officers during the years in issue were approximately the same percentage of gross sales and gross profits as the salaries in the immediately preceding three years. The bonus plan enabled the officers' salaries to reflect the increased value of the services rendered. Evidence presented at the trial established that at least two of petitioner's competitor pattern companies paid their officers base salaries plus bonuses. The salaries paid by petitioner were within the range of the salaries paid by its competitors, *192 taking into consideration the size oft he companies and the differences in the duties of the officers. Another fact which is of more than passing interest is that Harry was offered a $50,000 salary by a competitive company in 1939. He was undoubtedly more valuable to petitioner during the years in issue, due to his added experience, connections, and active participation in petitioner's business activities. Theodore's value to petitioner was recognized by petitioner's competitors. An officer of a competitive company testified, "I would think he [Theodore] would be [indispensable] to Superior Pattern." A comparison between petitioner's officers' salaries and the salaries of the other employees certainly does not bolster respondent's position. Journeyman patternmakers were paid $8,000 to $10,000 during the years in issue. Chuck Williams, petitioner's production superintendent, was paid approximately $25,000 annually during that period. Respondent does not consider Williams' salary to be excessive, yet he considers a reasonable salary for Ted and Bill to be $17,650 annually. The evidence clearly shows that each of petitioner's officers rendered more substantial services to petitioner *193 than did Williams during the years in question. The evidence presented by petitioner established that the salaries paid its officers were reasonable in amount. Respondent presented no witnesses or documentary evidence to contradict petitioner's evidence. Our consideration of the record as a whole revealed nothing deleterious to petitioner's position. Accordingly we have found as an ultimate fact that the salaries paid petitioner's officers during the years in issue were reasonable within the meaning of section 23(a)(1)(A), Internal Revenue Code of 1939, and section 162(a)(1), Internal Revenue Code of 1954. Decision will be entered under Rule 50.